JANICE LEVIN and BENJAMIN W. COHEN,

*vs.*

THE FISK RUBBER CORPORATION, a corporation of the State of Delaware, now dissolved.

*New Castle, May. 5, 1947.*

*Henry W. Bryan,* of Hering, Morris, James & Hitchens, and *Jacob Lippman,* of New York City, for complainants.

*Aaron Finger,* of Richards, Layton & Finger, for defendant.

HARRINGTON, Chancellor: The Fisk Rubber Corporation was dissolved in March, 1940 following the sale of all of its assets to the United States Rubber Company and the subsequent distribution of the proceeds of the sale to its stockholders. The payment of all corporate debts was assumed by the United States Rubber Company as a part of the consideration for the sale, and the preferred stock was redeemed after the sale had been consummated. The holders of the common stock of Fisk were, therefore, the sole owners of the corporation at the time of its dissolution. At that time, Janice Levin, one of the complainants, owned 50 shares of common stock of The Fisk Rubber Corporation

of the par value of $1.00 per share, and Benjamin W. Cohen, the other complainant, was the beneficial owner of 25 shares of common stock standing on the corporate records in the name of a nominee. The question is whether a receiver shall be appointed for The Fisk Rubber Corporation under *Section* 43 of the *General Corporation Law, Rev.Code* 1935, § 2075, in order to intervene as an essential party in a derivative action brought by the complainants against its former directors and others in the State of New York. The defendant was a Delaware corporation and could not be served with process in New York though, by amendment, it has been named a party defendant in that action. *Section* 43 provides:

"When any corporation organized under this Chapter shall be dissolved in any manner whatever, the Court of Chancery, on application of any creditor or stockholder of such corporation, at any time, may either appoint the directors thereof trustees, or appoint one or more persons to be receivers, of and for such corporation * * *."

The bill alleges among other things:

(1) That some time between October and December of 1939, the directors of The Fisk Rubber Corporation, for their personal profit and advantage, conspired with United States Rubber Company and others to sell all of Fisk's assets to United States Rubber Company at a price far below their real value;

(2) That among the chief assets of Fisk were certain patent rights pertaining to the manufacturing of cord tires of great value, the validity of which had been established by certain litigation in the federal courts, but which were carried on the corporate books at a nominal value of $1.00;

(3) That the alleged fraudulent scheme contemplated that the directors of The Fisk Rubber Corporation would approve and recommend to its stockholders the sale of all its assets, including these patent rights, to United States Rubber Company at a price based on their book value;

(4) That pursuant to that scheme the directors caused Fisk to agree to sell all of its assets to United States, and a contract to that effect was made on or about December 9, 1939;

(5) That the directors subsequently solicited the approval of that contract by the stockholders of Fisk and induced a majority of them to approve the contract of sale by fraudulently concealing and misrepresenting the value of its assets, and thereafter all of its assets were assigned and transferred to the United States Rubber Company to the damage of Fisk and of its common stockholders in a sum exceeding $5,000,000.

All known tangible assets of Fisk have been long since distributed to its stockholders, but the bill purports to state the nature of the fraud alleged to have been perpetrated on it by its directors and others, and on which a recovery in the pending New York action will be sought should a receiver be appointed by this court. As the New York suit is a derivative action, it cannot be prosecuted by the stockholders alone; the corporation must be a real party thereto.

When the circumstances require it, a receiver may be appointed for a dissolved corporation on the application of the proper interested persons. *Levin, et al., v. Fisk Rubber Corp.*, 27 *Del. Ch.* 200, 33 *A.* 2d 546. The appointment is, however, within the sound discretion of the court. *Wuerfel v. F. H. Smith Co.*, 25 *Del. Ch.* 82, 13 *A.* 2d 601; *Manning v. Middle States Oil Corp.*, 15 *Del.Ch.* 321, 137 *A.* 79; *Eastman, Gardiner & Co. v. Warren*, (5 *Cir.*) 109 *F.2d* 193. In determining whether a receiver should be appointed when the only possible asset consists of an alleged right of action growing out of a fraud said to have been perpetrated on the corporation, the court must give some consideration to the evidence of corporate rights. The appointment of a receiver is not mandatory merely because (1) the answer admits that the Fisk Rubber Corporation has been dissolved; (2) there is some good reason why the directors should

not be named trustees; and (3) the proof shows that the complainants are the legal or equitable owners of Fisk common stock and were such at the time of its dissolution. Even when a receiver has been appointed for a corporation, leave to bring a suit is often a matter within the discretion of the court. *Warner v. Conn.* 347 *Pa.* 617, 32 *A.2d* 740; *Denver City Water Works Co. v. American Water Works Co.,* 81 *N.J.Eq.* 139, 85 *A.* 826, affirmed Err. & App., 88 *A.* 1052; *Salembier v. Great Neck Bond & Mortg. Corp.,* 22 *Del.Ch.* 183, 194 *A.* 35. A court of equity will hardly lend its aid to the prosecution of an action unless there appears to be some reasonable basis for it. See *Denver City Water Works Co. v. American Water Works Co., supra.* While this court cannot determine the New York action, it can refuse to appoint a receiver for Fisk to participate in that action unless there is reasonable ground to believe that the fraud alleged was perpetrated on the corporation. The evidence does not sustain any such claim.

A demurrer to the complainants' bill was overruled at an earlier stage of the case, but for the purpose of determining that proceeding the defendant admitted all of its well pleaded allegations. *Levin, et al., v. Fisk Rubber Corp., supra.* Some proof of the complainants' charges is now required. In substance, the charge of the bill is that the directors of Fisk, for their own personal profit and advantage, conspired with others to conceal the value of its assets and to sell them to United States Rubber Company at a price far below their real value. The evidence discloses that the Fisk Rubber Corporation was engaged in the manufacture of various rubber products, but mainly in making automobile tires and tubes. In the fall of 1939, the Fisk management realized that its business position was not satisfactory. The company's sales were not increasing and it had lost a considerable number of its agencies which apparently preferred to handle tires of other concerns. After due consideration of the problem, the president of the United States Rubber Company was finally asked whether that

company would be interested in considering the purchase of all of the Fisk assets. On receiving an affirmative answer, capable negotiators were at once appointed by each corporation who were to attempt to work out satisfactory terms of sale. Apparently the negotiations continued for a considerable time and were clearly conducted at arm's length. Their progress is reflected by three letters written by the negotiator appointed by the United States Rubber Company to Mr. Behr, the negotiator for the Fisk Rubber Corporation, dated November 27th, November 30th and December 5th, 1939. The letter of November 27th, in part, stated:

"Following our conversations during the past few weeks, I am stating below a proposal for you to discuss with the Board of Directors of the Fisk Rubber Corporation at its next meeting.

"Our proposal is to deliver to Fisk 87,985 shares of common stock of United States Rubber Company and to pay to Fisk $2,639,522 in cash for all of the assets of Fisk, including cash, United States Rubber Company to assume Fisk's liabilities."

That offer, evidently, was not satisfactory to Fisk. The letter of November 30th, therefore, stated:

"Following our conversation of this morning, I am stating below a revised proposal for you to discuss with the Board of Directors of the Fisk Rubber Corporation.

"We propose to purchase from Fisk all of its assets and to assume Fisk's liabilities and in payment for this purchase we propose to deliver to Fisk 109,981 shares of United States Rubber Company common stock, $3,079,451 in cash and an additional cash payment of $50,000 to cover fees, etc."

Apparently, that offer was likewise rejected, and was followed by the letter of December 5th, 1939:

"Following our conversations since my letter of the 30th of November, I am stating below a further revised proposal for you to discuss with the Board of Directors of the Fisk Rubber Corporation.

"We propose to purchase from Fisk all of its assets and in payment therefore we propose:

"(a)  To assume all of Fisk's liabilities including income taxes;

"(b)  To pay to Fisk $6,695,730.25 in cash;

"(c)  To pay to Fisk such additional amount of cash as will provide for accrued dividends on the Fisk cumulative preferred stock from December 31, 1939 to the date of redemption of such preferred stock, but not later than 31 days after the closing;

"(d)  To pay to Fisk as a part of purchase price an additional amount of $300,000 in cash, to be used by Fisk for termination allowances, fees and expenses in connection with this transaction;

"(e)  To deliver to Fisk 109,981 shares of our common stock.

"The closing date shall be December 29, 1939, at which time the assets will be transferred and the price paid, but if the sale is not then approved by the Fisk stockholders, the closing date will be extended to a day not later than January 22, 1940. * * *

"Because of the necessity of having a formal contract, which would contain more detailed and comprehensive provisions than can well be stated in a letter, this proposal is not to be considered as a binding offer, and there is to be no commitment until a formal contract is signed."

United States Rubber Company made it clear that this was its final offer. Substantially the same provision, with respect to the execution of a formal contract, appeared in the prior letters.

The first offer of the United States Rubber Company was, therefore, $2,639,522 in cash, 87,985 shares of its common stock, and the assumption of all of Fisk's liabilities. On that basis, the common stockholders of Fisk would have realized from the sale a total sum substantially equivalent to the market price of their own shares. The market price of Fisk common stock was then approximately $10 per share, while United States Rubber common was selling at about $41. The only dividend paid on Fisk common since its reorganization in 1933 was 50 cents per share in 1938. No dividends had been paid on United States Rubber common stock since 1921. The Fisk business was not improving, and apparently some of its plants were being operated

at only about a 50% capacity, but United States Rubber Company was on the upgrade. The final offer, on which the sale agreement was based, was much more favorable to Fisk than the original offer; the cash payment was increased to $6,827,330.25 and the shares of the United States Rubber common stock to 109,981. The record indicates that Mr. Behr's knowledge of the rubber business enabled him to utilize every available trading resource for the benefit of Fisk; he played on the patents; he traded on the operating economies which United States Rubber could effect; and in other ways traded for the high dollar. The result of the negotiations was that when United States Rubber made its final offer, which with some slight changes, was accepted by the board of the Fisk corporation, the purchase price had advanced from the equivalent of about $10 per share for Fisk common stock to about $16.75 per share. This increase multiplied by Fisk's outstanding common stock (439,553 shares) amounted to $2,966,982.75. Apparently United States Rubber Company was induced to make that offer because of the advantage of quickly obtaining needed additional facilities without increasing the then excessive capacity of the tire industry. The complainants claim that in making that contract the directors were dominated by Charles E. Speaks, the president of Fisk, and by Karl H. Behr, both of whom profited directly or indirectly by the transaction. My attention has not been called to any evidence which shows that Mr. Speaks and Mr. Behr controlled the board. Mr. Speaks, as president of Fisk, was being paid an annual salary of $50,000 when the sale was negotiated and the contract made, though his election was on an annual basis and his term would have expired, legally at least, in about three months after the execution of the contract. There was some provision in the contract that Mr. Speaks might be called upon to act in an advisory capacity, but he was not to be regularly employed by United States Rubber Company; and because of the unexpected economic change in his position it was doubtless thought that he should be

given a substantial allowance at the termination of his employment. The equivalent of two years' salary, or $100,000, was agreed on as reasonable. Six other executives were in the same position, so it was agreed that termination allowances, amounting to $74,000, should also be distributed among them. Naturally, these payments were obligations of Fisk, but for some reason United States Rubber Company was finally asked to assume them and to deduct the necessary amounts from the tentatively agreed cash price. This resulted in a deduction of approximately 25 cents for each share of Fisk's common stock. These payments were provided for in the contract of sale and the stockholders had notice of them when they approved it. The complainants emphasize the fact that the stockholders had no notice that the arrangements made and the resulting necessary deduction in the cash payment were at Fisk's request but they do not show that Fisk's stockholders suffered any real loss thereby.

The contract of sale also provided for the payment of $50,000 to Dillion, Read & Company for the services performed for Fisk by Mr. Behr, a vice president of that company, in negotiating the sale and for necessary incidental expenses. In addition to the valuable services rendered by him and the time necessarily required, the accounting facilities of Dillion, Read & Company were used, and the sale involved more than $11,000,000. Fisk's outstanding stock issues were 33,675 shares of preferred (plus 400 shares owned by a subsidiary) and 439,553 shares of common stock. For some reason, it was deemed advisable that the preferred stock be redeemed and the figure was fixed by the contract at $110 and accrued and unpaid dividends thereon. The remainder of the purchase price was to be distributed to the holders of the common stock. In the notice to the stockholders it was pointed out that the redemption price for the preferred stock was advantageous to the Fisk holders.

The Fisk Rubber Corporation had ten directors and both Mr. Speaks and Mr. Behr were members of the board. Mr. Speaks owned 100 shares of preferred stock and 1500 shares of common; Mr. Behr owned no stock whatever. Carl P. Dennett, another director, was the record owner of 100 shares of Fisk preferred stock and the real owner of 750 shares of that stock. General Capital Corporation, of which Dennett was a 15% owner, was also the beneficial owner of 750 shares of Fisk preferred stock. Frederick M. Peyser, another director, was not the record owner of any of the Fisk stock and advised the directors that he had no beneficial interest in any of it; that was not denied. He was, however, a member of the firm of Hallgarten & Company, which was the record owner of a considerable number of shares of Fisk preferred and common stock and also of United States Rubber Company preferred and common stock. Neither Mr. Peyser nor Mr. Behr voted on the proposed contract of sale when it was considered by the Fisk board. With the possible unimportant exception of the request that United States Rubber Company pay the termination allowances to the Fisk officers, though in effect with Fisk's funds, all of these facts were disclosed by the printed pamphlet sent to the stockholders containing the notice calling the meeting to pass on the proposed contract of sale. The board recommended the approval of the sale, and a majority of the stockholders consented thereto.

There is no basis for the claim that the directors fraudulently concealed the value of Fisk's patents from its stockholders in order to secure their approval of the contract of sale. They were carried on Fisk's balance sheet at a value of $1.00, but the printed pamphlet accompanying the notice of the meeting stated:

"Patents are not carried on the Fisk balance sheet. Fisk owns a number of patents, including some on Fisk cord construction, which have recently been sustained in the courts and which may be found to have substantial value."

The Fisk management never valued these patents at

more than $300,000, and I am not satisfied that they were worth any more. That was the figure used by Mr. Behr in negotiating the terms of sale, and the gross recovery by United States Rubber Company in the infringement suits subsequently brought was approximately $200,000, but the various expenses incident thereto amounted to approximately one-half of that amount. Nor is there any basis for the claim that the Fisk assets were sold for an "unconscionably inadequate price", and that "millions of dollars in assets for which nothing was paid were concealed from the stockholders." The complainants' argument is apparently based on the theory that United States Rubber Company agreed to pay specified amounts for specified items on the Fisk balance sheet, and that there were values in items not appearing on that sheet, such as patents, the good will of a going concern, and market appreciation in the value of the company's inventory, for which it was not paid.

The letter of United States Rubber Company, dated December 5, 1939, made it clear that it was a mere tentative offer, binding neither party, if accepted, until a formal contract embodying numerous other details had been drawn and executed.

Furthermore, the executed contract shows that Fisk's assets were sold in bulk for a specified consideration, including cash and stock, and the stockholders knew that when they approved it. The complainants' argument is principally based on fragmentary quotations from documents which merely reflect the progress of the negotiations and do not establish fraud. The last Fisk's balance sheet, as of October 31, 1939, was sent to the stockholders prior to the meeting of December 29th, with the recommendation of the board with respect to the contemplated sale. In any aspect of the case that statement can hardly establish the value of the corporate assets listed in it for the purpose of showing that the sale was for a grossly inadequate price, though less than the total balance sheet figures. Nor is fraud established if some relatively unimportant assets were not dis-

closed thereby, or the inventory values had increased since the tentative contract of December 9th. The stockholders knew that all of the assets of a going concern were being sold and that its good will was being carried on the October balance sheet at $1.00. Under the circumstances I am satisfied that the charge that the corporation was defrauded by its former directors and others has not been proved.

The application for the appointment of a receiver will, therefore, be denied and a decree dismissing the bill will be entered.